### UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **MARGARET STILL,** | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| **VS.** | )   CASE NO. 08-CV-700-FHM |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of the** | ) |
| **Social Security Administration,** | ) |
| | ) |
| DEFENDANT. | ) |

### OPINION AND ORDER

Plaintiff, Margaret Still, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1]  In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1]  Plaintiff's May 26, 2006 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration.  A hearing before an Administrative Law Judge (ALJ) was held December 12, 2006.  By decision dated October 11, 2007, the ALJ entered the findings which are the subject of this appeal.  The Appeals Council denied review of the findings of the ALJ on November 14, 2008.  The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that

of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).

Even if the Court might have reached a different conclusion, if supported by substantial

evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908

(10th Cir. 2002).

Plaintiff was 58 years old at the time of the hearing. [Dkt. 8, p. 29].[2]  She claims

to have been unable to work since October 14, 2004, due to: pain and immobility of the

neck; pain in the shoulders, elbows and hands; migraine headaches; pain in the low

back, hips and right leg; and depression. [Dkt. 8, pp. 108, 113, 133, 138, 142].  Her

education consists of a GED and some vocational training and she previously worked

as a beautician and a nurse technician. [Dkt. 8 pp. 31-57, 127, 131]. The ALJ

determined that Plaintiff has severe impairments consisting of degenerative disc

disease of the cervical[3] spine, osteoarthritis, depression and anxiety. [Dkt. 8, p. 13].

Despite these impairments, the ALJ found that Plaintiff retains the residual functional

capacity (RFC) to perform light work except that she would need to avoid climbing

ladders, ropes or scaffolds. [Dkt. 8, p. 14].  Based upon the testimony of a Vocational

Expert (VE), the ALJ determined that Plaintiff's RFC did not preclude her past relevant

work (PRW) as a hairdresser. [Dkt. 8, p. 19].  He also found that there are other jobs

available in the economy that Plaintiff can perform with her RFC. [Dkt. 8, p. 20].  He

---

[2] All citations to the record reflect the page number assigned by the CM/ECF docketing system. Since the CM/ECF system counts unnumbered cover pages and preliminary pages (i, ii, etc.) and the administrative record [Dkt. 8] was filed in four parts (8, 8-2, 8-3, 8-4), the docket reference may not necessarily be the same as page numbers or bates-stamped numbers on the document.

[3] Cervical: of or relating to a neck or cervix. See medical dictionary online at: http://www2.mer riam-webster.com/cgi-bin/mwmednlm?book=Medical&va=cervical.

2

therefore concluded that Plaintiff is not disabled as defined by the Social Security Act. [Dkt. 8, p. 21]. The case was thus decided at step four, with an alternative step five finding, of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the following allegations of error: 1) the ALJ used an improper "reasonable degree of certainty" standard; 2) the ALJ did not properly evaluate the surgical issues surrounding Plaintiff's neck problems; 3) the ALJ failed to mention any of the extensive medical treatment of Bhadresh Bhakta, M.D.; 4) the ALJ gave no limitations to Plaintiff's neck and left arm despite the cervical ruptured disk diagnosis and EMG showing C6 inflammation, positive Spurling's sign and spasms findings by more than one treating physician;  5) the ALJ improperly discounted Dr. Mahaffey's RFC opinions; 6) the ALJ improperly adopted the DDS RFC; and 7) the ALJ failed to set out a substantial amount of Plaintiff's treatment. [Dkt. 11].  For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for  reconsideration.

## **Medical Evidence**

Plaintiff's medical treatment records begin in December 1999 when she complained of neck and back pain after lifting a patient at St. Francis Hospital. [Dkt. 8-3, pp. 72-74].  She was diagnosed with lumbosacral strain and x-rays revealed spondylosis and degenerative disk disease in her cervical spine. *Id.*  David R. Hicks, M.D., who performed a workers' compensation evaluative examination on February 3,

3

2000, noted abnormal cervical range of motion (ROM) and Spurling's[4] tests and ordered an "arthritis screen" including an HLA-B27[5] and sed rate tests. [Dkt. 8-3, pp. 65-67].   On March 6, 2000, Dr. Hicks reported the HLA-B27 was normal and opined Plaintiff's primary problem appeared to be inflammatory myofascial dysfunction. [Dkt. 8-3, pp. 62-63].   He released Plaintiff to work in full duty capacity and referred her to another physician for migraines. *Id.*

Allan S. Fielding, M.D., a neurosurgery specialist, examined Plaintiff on March 31, 2000, and recommended a cervical MRI which revealed diffuse bulge and disk degeneration at C6-7. [Dkt. 8-3, pp. 76-79].   Dr. Fielding opined that the "very minimal degeneration within the C6-7 disc" would be expected for a 50-year-old person and recommended that Plaintiff return to work full-time without restrictions. [Dkt. 8-3, p. 75].

On January 24, 2001, Armen Marouk, D.O., another neurosurgical specialist, examined Plaintiff at the request of Matthew Johnston, M.D. [Dkt. 8-4, pp. 57-58].   Dr. Marouk found decreased cervical ROM, positive Spurling's test, weakness involving the tricep muscle on the left, decreased left tricep reflex and hypesthesia (decreased sensibility) into the thumb and index finger. *Id.*   He also noted some back pain during the straight leg raising (SLR) test.   Based upon myelogram and post myelographic CT studies, he diagnosed ruptured disk with spondylosis at the C6-7 and lumbar

---

[4]   Spurling's is a foraminal compression test to diagnose cervical radiculopathy (disease affecting the spinal nerve roots). *See* medical information online at: http://222.nlm.hih. gov/medlineplus /ency/article/000442.htm (last updated 7/10/2009).

[5]   HLA-B27 is a blood test to look for specific protein, called human leukocyte antigen B27, on the surface of white blood cells. A normal (negative) result means HLA-B27 is absent. A positive test means HLA-B27 is present and suggests a greater-than-average risk for developing Ankylosing spondylitis, Reiter syndrome and Sacroiliitis (inflammation of the scroiliac joint). *See* medical information online at: http://222.nlm.nih.gov/medlineplus/ency/article/003551.htm (last updated 5/21/09).

4

spondylosis and recommended trying conservative treatment consisting of physical therapy and epidural steroid injection "prior to surgical recommendations." *Id.*

The next medical report appearing in the administrative record is from Dr. Marouk, dated July 26, 2002, addressed to Robert Mahaffey, M.D. [Dkt. 8-4, p. 56].  He reported Plaintiff had not followed up with him after the January 24, 2001 appointment, that Plaintiff had "persistent symptoms since" and had incurred another neck injury causing worsening pain.  Physical examination revealed decreased ROM of the cervical spine, positive Spurling's test, trace of weakness in the right tricep and diminished left tricep reflex.  Dr. Marouk noted that a July 2002 MRI showed worsening of cervical spondylosis at the C6-7 level and neural foramen narrowing on both sides.  He ordered an EMG of Plaintiff's upper extremities. *Id.*

On October 11, 2002, Dr. Marouk reported to Dr. Mahaffey that Plaintiff had failed to respond to conservative therapy.  He wrote: "I did discuss with Margaret that she may benefit from a surgical diskectomy and fusion."[6]  He reported he had also discussed another test that could confirm his diagnosis and described it to her.  Plaintiff was to contact him the following week with her decision. *Id.*

An extensive report by Ghadresh Bhakta, M.D., a pain management specialist, addressed to Dr. Marouk is dated November 19, 2002. [Dkt. 8-4, pp. 21-23].  Dr. Bhakta diagnosed myofascial neck and shoulder pain; history of cervical degenerative disk disease; low back pain; diffuse multi-joint arthritic-type pain; and mild depression,

---

[6] Diskectomy is surgery to remove all or part of a cushion that helps protect the spinal column. These cushions, called disks, separate the spinal bones (vertebrae). See medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/007250.htm (last updated 3/4/2009).

5

secondary to pain.  He discussed with Plaintiff the possibility of a cervical discography[7] to try and isolate a causative structure for her pain.  He explained that the test was not designed to treat any of her symptoms and that the procedure itself may temporarily worsen her pain by sensitizing her disks.  He also discussed other options, including surgery.  He wrote: "Overall, the patient indicated that she would like to consider all the information presented and discuss her options further before proceeding with cervical discography and then surgery." *Id.*

On January 28, 2003, Dr. Bhakta reported that Plaintiff had received an epidural injection which "did help 'the deeper' pain"  but that she continued to have diffuse pain involving not only her cervical but her thoracic spine and low back. [Dkt. 8-4, pp. 19-20]. Again a discussion was held about a cervical discogram "then it may lead up to surgery, which may possibly help with her cervical spine pain but it is doubtful that she would get much relief from her mid or low back complaints." *Id.*  He recommended one or two more injections to see if further relief could be obtained. *Id.*

On March 3, 2003, Dr. Marouk reported to Dr. Mahaffey that Plaintiff had undergone a diskogram which was positive at the C6-7 level and that her symptoms were also reproduced at C5-6 as well as some other pain in her neck. [Dkt. 8-4, p. 54]. He said:

> She made him stop the test mainly due to pain. The problem

---

[7] A discography is a neurological diagnostic outpatient procedure, often suggested for patients considering spinal surgery or whose back pain has not responded to conventional treatment.  The patient wears a metal-free hospital gown and lies on an imaging table; the physician numbs the skin with anesthetic and inserts a thin needle, using x-ray guidance, into the spinal disc. Once the needle is in place a small amount of contrast dye is injected and CT scans are taken. The contrast dye outlines any damaged areas. See medical information online at: http://www.ninds.nih.gov/disorders/misc/diagnostic_tests.htm (last updated September 15, 2009).

that we see is that she does not have a normal looking disk. She does have Diskogenic disease at the C6-7 level and at that C5-6 level however I am not sure that she has a normal disk throughout her cervical spine. I did discuss with her that I prefer that she be treated with pain management. I will refer her to see Dr. Bhakta for this. I do not have any good surgical recommendations for her at this point in time. Should her symptoms not respond to conservative modalities, I would be happy to see her back in the office however she would require further diagnostic testing.

[Dkt. 8-4, p. 54].

Dr. Bhakta reported on March 27, 2003, that he discussed with Plaintiff various ways of managing chronic pain, including occasional physical therapy, learning coping skills, seeking a rheumatologist and pain medication. [Dkt. 8-4, p. 18]. He noted that Plaintiff "definitely indicated that she did not wish to pursue anymore testing for the time being since surgery is not a high option on her list at this time." *Id.*

On May 8, 2003, Dr. Bhakta reported to Dr. Mahaffey that Plaintiff's combination of OxyContin and Oxycodone[8] medication helped, that she had started physical therapy, which also helped quite a bit, and that she had an appointment with a rheumatologist. [Dkt. 8-4, pp. 15-16]. He observed that Plaintiff was overall doing well but noted that if she continued to have weakness in her arms, "which is progressing, then the risks/benefit ratio would tend to favor going ahead with possible surgery but if pain is the main problem, then there are no guarantees [that] surgery would help." *Id.*

Timothy L. Huettner, M.D., a rheumatologist, reported on May 22, 2003, that Plaintiff's cervical spine was nontender but that she did have marked decreased motion

---

[8] Oxycodone is an opiate (narcotic) analgesic used to relieve moderate to severe pain. *See* drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last reviewed 02/01/2009).

in the cervical and lumbar spine in all directions. [Dkt. 8-3, pp. 83-86].  He diagnosed

degenerative cervical disc disease and cervical radiculopathy and stated that there was

not much else he could do for her.  He recommended increasing her ibuprofen, noting

her prior problems with peptic ulcer disease and started her on Prevacid to prevent

stomach ulcer.  He sent a note via Plaintiff to Dr. Mahaffey and asked him to obtain

lumbar and pelvis x-rays which reflected asymmetric loss of joint space in both hips

compatible with osteoarthritis. [Dkt. 8-3, p. 82].  Dr. Huettner added osteoarthritis of the

hips to his diagnoses when he wrote to Dr. Mahaffey on June 19, 2003, saying:

> - at this point I really do not think I have anything further to
> offer her. She really has not been able to tolerate NSAID
> medications so far. If she is anemic, then I think she should
> be off ibuprofen and NSAIDs completely and I told her this.
> I told her this specifically included ibuprofen. I also told her
> that she may have to reconsider having surgery on her neck
> as she was advised to have about 3 years ago. She is
> already taking OxyContin and Soma. She did not get any
> relief from Ultram in the past.

[Dkt. 8-3, p. 80].

Dr. Bhakta discussed the use of ibuprofen and newer nonsteroidals with Plaintiff

on July 10, 2003, and decided to try Keppra.[9] [Dkt. 8-4, pp. 13-14].   He told Dr.

Mahaffey: "We did discuss as far as long-term plan that if she continues to be bothered

then surgery may become a stronger option for her but as long as she is functioning

and able to live with the pain then surgery can be deferred, especially given the fact that

she has diffuse generalized pain." *Id.*  Dr. Bhakta reported on August 19, 2003, that

---

[9]  Keppra (Levetiracetam) is an anticonvulsant, used in combination with other medications to
treat certain types of seizures in people with epilepsy. *See* drug information online at: http://www.nlm
.nih.gov/medlineplus/druginfo/meds/a699059.html (last revised 09/01/2009).

8

Plaintiff was intolerant of Keppra which caused nausea and mood swings. [Dkt. 8-4, pp. 11-12]. He planned to try Lidoderm patches[10] and continue OxyContin and Oxycodone. He noted that Plaintiff was no longer working because of the pain, that her current medications helped with the pain but, with excessive activity, the medications were not adequate. *Id.*

Plaintiff reported to Dr. Bhakta on October 28, 2003, that the Lidoderm patches did help "quite a bit" and continued to do well on OxyContin "which also helps." [Dkt. 8-4, pp. 9-10]. She told the doctor she had recently lost her mother which caused a slight increase in her anxiety and stress levels. *Id.* Dr. Bhakta added a prescription for Actiq, a narcotic, "for better breakthrough [pain] control," to try as a possible future alternative to Oxycodone. *Id.* On December 30, 2003, Dr. Bhakta encouraged Plaintiff to find a pharmacy that carried Actiq "for any of the severe pain that she has" and to continue with exercising her hands and arms to maintain strength. [Dkt. 8-4, pp. 7-8]. He advised her to consider a second surgical opinion or perhaps myelography or EMG studies to rule out any significant problems if her symptoms continued. *Id.*

In April and May 2004, Plaintiff was seen in the emergency room three times for chest pain, vomiting, sweating and headaches and was diagnosed each time with gastroesophageal reflux disease (GERD). [Dkt. 8-2, pp. 63-66; 8-3, pp. 1-7]. She was seen in follow-up by Dr. Mahaffey, who also treated her for migraine headaches during this time period. [Dkt. 8-2, p. 4]. Plaintiff was seen by Dr. Mahaffey on June 15, 2004,

---

[10] Lidoderm (Lidocaine Transdermal) patches are anesthetics, used to relieve the pain of post-herpetic neuralgia by stopping nerves from sending pain signals. *See* drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html (last reviewed 09/01/2008).

July 30, 2004 and September 23, 2004, for elevated blood pressure, GERD, migraines, urinary tract infections and neck and back pain. [Dkt. 8-2, pp. 1-3].

All this occurred before Plaintiff's claimed disability onset date of October 14, 2004. [Dkt. 8, pp. 11, 108, 113].  In her work activity report and at her hearing, Plaintiff claimed she opened her own hair styling shop after her on-the-job injury at St. Francis in 2002 and worked on a part-time basis until February 2006.  [Dkt. 8, pp. 31-35, 118]. The Commissioner has determined that Plaintiff "never [had] substantial gainful activity earnings" from her business because she operated it on a part-time basis, she did not have a net profit in 2004, her net profit for 2005 was $1338 and she had no net profit in 2006. [Dkt. 8, p. 121].

Dr. Mahaffey continued treating Plaintiff and on December 2, 2004, he recorded treatment for fibromyalgia, neck and lower back spondylosis, menopause, sleep apnea, anxiety, depression, increased cholesterol, vaginal dryness, allergies, dyspesia, anemia and migraines. [Dkt. 8, pp. 173-174].  Plaintiff's medications were listed as Premarin, Roxycodone, OxyContin, Soma, Zocor, Claritin, Ambien, Xanax and Ibuprofen. *Id.*  Dr. Mahaffey saw Plaintiff again on April 8, 2005, July 26, 2005, and September 26, 2005, noting abnormal findings upon physical exam of Plaintiff's neck and back and recording continuing complaints of back and neck pain due to degenerative disk disease and osteoarthritis. [Dkt. 8, 170-172].  An October 7, 2005 MRI showed mild posterior disk bulges at C3-4 and C5-6 and degenerative disk disease at C6-7 with posterior osteophyte/disk complex which mildly compresses the cord. [Dkt. 8-2, p. 27; 8-3, p. 9]. The lumbar MRI, conducted the same date, was negative. [Dkt. 8-2, p. 28, 8-3, p. 10]. Dr. Mahaffey treated Plaintiff again on January 11, 2006, for dizziness, weakness and

10

pain in the mid-back and he saw her for an emergency room follow-up on March 1, 2006, for pain in the back of the leg. [Dkt. 8, p. 169; 8-2, pp. 5-26; 8-3, pp. 12-25; 8-4, pp. 35, 40-41; 8, pp. 166-168].  He noted continuing chronic neck and back pain, fibromyalgia and stress due to "recent separation." [Dkt. 8, p. 166].

Plaintiff moved to Texas sometime between March and May 2006 where she received treatment from Joel Saldana, M.D. [Dkt. 8-2, pp. 34-35; 8-3, pp. 45-54].  Dr. Saldana recorded chief complaints of: moderate heart burn, moderate anxiety, hyperlipidemia, moderate hypertension and severe back and neck pain (intolerable without taking meds) aggravated by change of position and walking, relieved by rest and analgesic meds.  *Id.*  Her referred Plaintiff to Luci Nguyen, M.D., for pain management. [Dkt. 8-2, pp. 37-62; 8-3, pp. 31-32, 46-47].  Upon physical examination, Dr. Nguyen wrote:

> She has severe spasms in the bilateral upper trapezius.
> Good range of motion is noted in the shoulder and elbow.
> Positive Spurling's and Lhmett's test noted. Straight leg raise
> is positive.

*Id.* Dr. Nguyen's impression was that Plaintiff's complaints of pain radiating to the left arm and back pain radiating to the right leg, described as burning and shooting with associated weakness to the left arm and right leg, were consistent with C6 cervical radiculopathy and L-5 radiculopathy.  She renewed Plaintiff's Oxycodone and Soma medications to "help relieve pain." *Id.* Dr. Nguyen reported the nerve conduction study on June 19, 2006, indicated C6 radiculitis with denervation seen in paraspinous and bicep femoris muscle and she recommended a trial of Lyrica (an anti-epileptic drug used to treat neuropathic pain) and, if no improvement, an epidural injection. [Dkt. 8-3,

11

pp. 28-30].[11]   The MRI of the cervical spine revealed no significant abnormalities at C2-3 and C7-T1; but did show the presence of mild disk bulge with a tiny right paracentral disk protrusion which did not result in central canal or neural foraminal stenosis at C3-4; a mild disk bulge/osteophyte complex that did not result in central canal or neural foraminal stenosis at C4-5; and at C6-7, mild disk bulge/osteophyte complex asymmetrically greater on the right that did not result in significant central canal or neural foraminal stenosis. [Dkt. 8-3, pp. 33-34]. The MRI of the lumbar spine was normal. [Dkt. 8-3, p. 35].

On July 13, 2006, Plaintiff returned to Dr. Mahaffey. [Dkt. 8-4, p. 43].   Her medication list was updated to include Lyrica, Oxycodone and Soma.  Her gait was recorded as antalgic.  She was assessed with cervical lumbar myalgia and referred to physical therapy for pain rehab. *Id.*  Plaintiff reported hip and shoulder pain to Dr. Mahaffey on August 3, 2006. [Dkt. 8-4, p. 42].  Dr. Mahaffey found spasms in the neck but good shoulder ROM.  He prescribed an injection for relief and renewed Plaintiff's medications. *Id.*  On September 11, 2006, Dr. Mahaffey recorded depression, chronic neck and back pain and decreased ROM of the neck. [Dkt. 8-3, p. 32].  He prescribed Prozac and noted that Plaintiff was signed up to see marriage counselors.  He continued Plaintiff's OxyContin and other medication. *Id.*  At the six week follow-up appointment on October 24, 2006, Dr. Mahaffey's findings included spasms in the neck and shoulders and depression. [Dkt. 8-4, p. 31].  On November 28, 2006, Dr. Mahaffey noted Prozac was helping Plaintiff's depression, that she had OA (osteoarthritis) in her

---

[11]   A copy of Dr. Nguyen's EMG/Nerve Conduction Study was included in Dr. Mahaffey's treatment records. [Dkt. 8-4, pp. 44-45].

hands and wrists and chronic pain. [Dkt. 8-4, p. 30].  He recorded abnormal findings of the neck musculature. *Id.*[12]

Dr. Mahaffey's records from January 24, 2007, May 31, 2007, and July 10, 2007, show treatment for upper respiratory infection, insomnia, chronic and persistent pain in the neck and shoulders, degenerative disk disease, arthritis, depression and anxiety. [Dkt. 8-4, pp. 27-29, 34-38].

On August 20, 2007, Dr. Mahaffey signed a Medical Source Statement regarding Plaintiff's ability to perform activities on a regular and continuing basis. [Dkt. 8-4, pp. 46-53].  Dr. Mahaffey assessed "marked loss" in ability to remember work like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to maintain concentration and attention for extended periods of 2-hour segments; to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (depends on how body feels); to sustain an ordinary routine without special supervision and to deal appropriately with changes in a routine work setting. [Dkt. 8-4, pp. 46-47].  He indicated "moderate loss" in Plaintiff's ability to work in coordination with or proximity to others without being unduly distracted by them; to make simple work-related decisions; to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. *Id.*  He found

---

[12]  Counsel for the Commissioner cites notations in Dr. Mahaffey's records indicating normal clinical findings of neck, respiratory, cardiac and musculoskeletal systems as support for his contention that the record did not reveal any significant work-related functional restrictions in addition to those the ALJ imposed. [Dtk. 12, p. 6].  Dr. Mahaffey's handwritten notes are largely illegible but check-marks on the forms used for performing systems examinations indicate normal findings of the neck as to masses, symmetry, lymph nodes and thyroid but abnormal musculature and neurological findings.

Plaintiff had an "extreme loss" in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. [Dkt. 8-4, p. 47]. He wrote: "Due to chronic pain and pain medicines and need for change in position (laying, sitting, standing) that varies day to day, she has trouble maintaining a schedule, being dependable, concentrating, remembering." [Dkt. 8-4, p. 48].

On the Medical Source Statement addressing Plaintiff's ability to perform physical activities involving postures of the neck, Dr. Mahaffey indicated Plaintiff could perform "rarely/none:" forward flexion, looking down at a table or desk; and backward flexion, looking upward to ceiling/sky. [Dkt. 8-4, p. 49]. Plaintiff could "occasionally" perform rotation right and left. *Id.* He answered: "yes" to the question: "Is it medically necessary for this patient to elevate the legs while sitting to minimize numbness and tingling. *Id.* He wrote: "'periodically' gets up and down" "elevates  [up to] 6x/day." *Id.* He selected "Elevation to waist level" when asked what degree of elevation is appropriate. [Dkt. 8-4, p. 50]. He indicated Plaintiff can be expected to remain continuously seated before alternating postures by standing or walking about as 15 minutes. *Id.* For total cumulative sitting during an 8-hour work day, not including time spent standing or walking about, Dr. Mahaffey indicated two hours. *Id.* He opined Plaintiff's ability to stand or walk varies, with a maximum of one hour, after which she would need to alternate posture by sitting, lying down or reclining in a supine position and sitting in a working position at a desk or table sometimes depending on how she feels. *Id.* He indicated this period of lying down or reclining before returning to standing or walking would be 30 minutes. [Dkt. 8-4, p. 51]. Total cumulative standing or walking

14

during a 8-hour work day was limited to four hours. *Id.* Regarding how much Plaintiff would need to rest, he indicated a morning break, a lunch period and an afternoon break scheduled at approximately 2 hour intervals was sufficient and wrote: "varies with day." *Id.* The reason given for these limitations was to relieve pain and nervousness. *Id.* Total cumulative resting, lying down or reclining needed in an 8 hour workday was assessed at 3 hours. *Id.* [Dkt. 8-4, p. 52]. Lifting and carrying limitations for all weights up to 50 pounds were assessed as "Rarely/None (no sustained/8hrs)." Balancing when standing/walking on level terrain was limited to "Occasionally" and stooping was "Rarely/None." *Id.* Dr. Mahaffey wrote that this assessment was premised upon diagnoses of neck spondylosis, fibromyalgia, right leg neuralgia, persistent and chronic back pain, migraine headaches, depression and anxiety. [Dkt. 8-4, p. 53].

### Agency Physician Opinion

On July 5, 2006, Kelvin Samaratunga, M.D., reviewed Plaintiff's medical records and, based upon a primary diagnosis of "mild degenerative disease @ C3-4,"[13] opined Plaintiff could: occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday; sit (with normal breaks) about 6 hours in an 8-hour work day; that she had an unlimited ability to push and/or pull (including operation of hand and/or foot controls) and that she could never perform balancing activities. [Dkt. 8-3, p. 37-39]. Dr. Samaratunga based his opinion on medical records dated June 12, 2006, the June 19, 2006 EMG and MRIs and a "6/2/06 neck stiff

---

[13] Dr. Samaratunga did not address additional diagnoses of ruptured disk with spondylosis at C6-7, diskogenic disease at C5-6, osteoarthritis and lumbar spondylosis.

but no other disability noted."[14] [Dkt. 8-3, p. 44].

## The ALJ's Decision

After summarizing Plaintiff's hearing testimony, the ALJ noted Dr. Hicks' March 6, 2000 HLA-B27 study and opinion that Plaintiff's primary problem appeared to be inflammatory myfascial dysfunction and that she was able to work in a full duty capacity. [Dkt. 8, p. 16].  The ALJ set forth the April 14, 2000 MRI findings and Dr. Fielding's opinion that the cervical studies were normal for the claimant's age.  He acknowledged Dr. Marouk's 2003 medical findings, noting that the "discogram revealed the absence of any normal looking discs" and said: "Dr. Marouk was of the opinion the claimant should be treated with pain management, and did not have any surgical recommendations at that point in time." [Dkt. 8, p. 16].

As to Dr. Mahaffey, the ALJ stated Plaintiff was treated on a routine basis "for a variety of complaints to include neck and back pain, trouble sleeping, sinus infections, sore throat, urinary tract infection, depression, dizziness and weakness." [Dkt. 8, p. 16]. He said an Oct. 5, 2005 cervical MRI "revealed mild posterior disc bulges at C3-4 and C4-5, and degenerative disc disease at C6-7 with posterior osteophytes."[15] [Dkt. 8, p. 17].  He set out the normal lumbar MRI findings in full. *Id.*  Dr. Mahaffey's treatment records from September 11, 2006, and October 24, 2006, were also mentioned. *Id.*  The ALJ reported Dr. Nguyen's findings upon physical examination, EMG study and MRIs of the cervical and lumbar spine. [Dkt. 8, p. 17].   He accurately summarized Dr.

---

[14]  The Court has combed the record and has not found any medical treatment record or opinion containing this statement.

[15]  The complete description is: "There is a central and posterior right paracentral protrusion of disk material/osteophyte complex at C6-7 which slightly compresses the cord." [Dkt. 8-2, p. 27].

Mahaffey's Medical Source Statements. [Dkt. 8, p. 17].

With regard to Plaintiff's credibility, the ALJ said: "The claimant's statements about her impairments and their impact on her ability to perform activities of daily living and basic functions are not entirely credible in light of discrepancies between the claimant's alleged symptoms, and objective documentation in the file." [Dkt. 8, p. 18]. By way of explanation, he found that Plaintiff's described daily activities, which include care of a child, housework, doing the dishes, sweeping and mopping, making the bed, laundry and some cooking were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." *Id.* He then said Plaintiff "described daily activities which are fairly limited" but concluded that they cannot be objectively verified with any reasonable degree of certainty and that they are difficult to attribute to her medical condition "as opposed to other reasons." *Id.* He wrote:

> As far as medical care, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual, and the treatment the claimant has received for the allegedly disabling impairments has been essentially routine and conservative in nature. With regard to medication side effects, although the claimant has alleged various side effects from the use of medications, the medical records, such as office treatment notes, do not corroborate those allegations.

*Id.* He discounted Plaintiff's allegations of totally disabling pain, stating that "when compared with the total evidence, [the pain] is not severe enough to preclude all types of work." *Id.*

The ALJ reported on the findings of the agency's medical consultant and adopted those RFC findings as "consistent" with the medical evidence, noting that agency physicians are experts in assessing physical and mental limitations that "reasonably

flow from a medical condition." [Dkt. 8, p. 19].  He stated that he gave "little weight" to

Dr. Mahaffey's opinion, saying:

> ...the doctor apparently relied quite heavily on the subjective
> report of symptoms and limitations provided by the claimant,
> and seemed to uncritically accept as true most, if not all, of
> what the claimant reported.  Yet, as explained elsewhere in
> this decision, there exist good reasons for questioning the
> reliability of the claimant's subjective complaints.  The
> course of treatment pursued by the doctor has not been
> consistent with what one would expect if the claimant were
> truly disabled, as the doctor has reported.  Further, the
> doctor has placed extreme limitations on the claimant's
> ability to perform daily activities of living, which are
> inconsistent with the claimant's own testimony.

[Dkt. 8, p. 19].

## Discussion

After review of the record in this case, the Court finds the ALJ's decision is not

supported by substantial evidence because the ALJ did not demonstrate that he had

properly considered the medical evidence, he did not set forth legitimate reasons for

discounting the treating physician's opinion and he did not properly consider Plaintiff's

credibility.

### Medical Evidence Not Properly Considered

The medical record contains an abundance of evidence regarding Plaintiff's

cervical and lumbar spondylosis, radiculopathy, degenerative disk disease and

osteoarthritis and numerous attempts by her treatment care providers to alleviate the

pain, stiffness, spasm and weakness caused by those impairments.

The ALJ's discussion of the medical evidence was cursory and dismissive.  He

set forth Dr. Marouk's findings and portions of Dr. Nguyen's reports, but he did not

18

disclose the weight he accorded their opinions or explain how that evidence factored into his determination.  The ALJ did not mention the records from Dr. Bhakta, a pain management specialist, or from Dr. Huettner, a rheumatologist, who treated Plaintiff at the behest of Dr. Marouk.  He presented a portion of Dr. Nguyen's report but failed to mention her findings that tend to support Plaintiff's claims, i.e. positive Spurling's and Lhmett's test, <u>severe</u> spasms in the bilateral upper trapezius and radicular pain. Although the ALJ need not discuss all of the evidence in the record, he "may not ignore evidence that does not support his decision, especially when that evidence is significantly probative." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001).

Counsel for the Commissioner asserts the ALJ was not required to mention medical evidence from the pre-adjudicated period, prior to October 14, 2004. [Dkt. 12, p. 3-5].  The Court notes, however, that both the ALJ and counsel for the Commissioner referred to and appeared to rely upon the 2000 and 2003 reports from Dr. Hicks and Dr. Fielding in concluding that the medical evidence did not support Plaintiff's claim of disabling pain after October 14, 2004.  The Commissioner may not pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence. *See Hardman v. Barnhart,* 362 F.3d 676, 681 (10th Cir.2004) ( the ALJ is not free to substitute his own opinion for the physician's).

Because the ALJ failed to demonstrate that he properly considered all the medical evidence, particularly the evidence supporting Plaintiff's testimony and her treating physician's opinion, the Court cannot find that his conclusions are supported by substantial evidence. *See Hamlin v. Barnhart*, 354 F.3d 1208, 1215, 1219 (10th Cir.

19

2004) ("An ALJ must evaluate every medical opinion in the record"); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001) (When an ALJ does not provide any explanation for how medical evidence was considered and weighed, the Court cannot meaningfully review the ALJ's determination).

### Treating Physician's Opinion

It is well settled that an ALJ must give controlling weight to the opinion of a treating physician if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).

Dr. Mahaffey was Plaintiff's treating physician as early as September 2000 and remained so through the date of the ALJ's decision.  The ALJ accorded Dr. Mahaffey's Medical Source Statement "little weight" because he concluded that the doctor had relied quite heavily on Plaintiff's subjective complaints and that his treatment was not consistent with "what one would expect if the claimant were truly disabled."  He further found the doctor's "extreme limitations on the claimant's ability to perform daily activities of living" were inconsistent with Plaintiff's own testimony. [Dkt. 8, p. 19].

Dr. Mahaffey performed his own diagnostic procedures including physical examinations, range of motion tests, x-rays and blood work. In addition, Dr. Mahaffey was either the addressee or was copied on the reports generated by Drs. Marouk, Bhatka, Huettner, Saldana and Nguyen as well as the discogram, MRIs, nerve conduction studies and other clinical tests they conducted.  None of the specialists' opinions or findings were cited by the ALJ as medical evidence that contradicted Dr. Mahaffey's opinion.  Indeed, none of those physicians ever suggested Plaintiff's

complaints of severe pain in her neck, shoulders, arms, lumbar spine and hips and stiffness and numbness were fabricated, extreme or exaggerated and their records reveal that they either recommended or employed a variety of diagnostic and pain management techniques in attempts to alleviate Plaintiff's symptoms.  While the ALJ's statement that Dr. Marouk had recommended that Plaintiff be treated with pain management rather than surgery is not incorrect, it is clear from the records of Drs. Marouk, Bhakta and Huettner that they all encouraged Plaintiff to consider cervical diskectomy and fusion despite their recognition that relief of all Plaintiff's symptoms could not be guaranteed by surgery.   Plaintiff had made it clear that she did not want to attempt a second discography which Dr. Marouk required before performing surgery. That Dr. Marouk recommended pain mangement "rather than surgery" was therefore not sufficient grounds for diminishing the severity of Plaintiff's symptoms.

Dr. Mahaffey was Plaintiff's long-term and frequent general health care provider and he was privy to the reports and opinions of the specialists and the tests they relied upon when he evaluated Plaintiff's ability to perform work-related functions.  Therefore, the ALJ's presumption that Dr. Mahaffey's opinion was based upon Plaintiff's subjective complaints rather than medically acceptable clinical and laboratory diagnostic techniques, is not supported by the record.

The second reason given by the ALJ for assigning "little weight" to Dr. Mahaffey's opinion, was that the treatment he pursued was not consistent with treatment "one would expect" for a person with Plaintiff's impairments.  As the record shows, the specialists treating Plaintiff applied a number of conservative treatment techniques in efforts to control her symptoms, including discography, physical therapy, epidural

injections and medication, some of which were opiates and narcotics.[16]  Dr. Mahaffey continued the medications and epidural injections Dr. Bhakta and Dr. Nguyen had prescribed for pain control and he monitored Plaintiff's condition on a six-week follow-up basis.  The ALJ did not describe what treatment would be expected "if the claimant were truly disabled, as the doctor has reported" nor did he explain how the treatment that Dr. Mahaffey was providing demonstrated that Plaintiff did not have the functional limitations he assessed in his Medical Source Statements.  Because there was no medical basis for the ALJ to reach this conclusion, his second reason for discrediting Dr. Mahaffey's opinion is not legitimate. *See Drapeau*, 255 F.3d at 1213 (the ALJ must give good reasons in his decision for the weight he ultimately assigns the treating physician's opinion); 20 C.F.R. § 404.1527(d)(2).

The Court finds that the ALJ did not properly analyze Dr. Mahaffey's opinion to determine if it was entitled to controlling weight and he did not explain the weight he accorded Dr. Mahaffey's opinion in assessing Plaintiff's RFC. *See Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007) (describing the relevant factors the ALJ must consider in determining whether treating physician's opinion is entitled to controlling weight or some lesser weight).

### Credibility

First, the ALJ said Plaintiff's described daily activities were not limited to the extent that would be expected for someone who has the symptoms Plaintiff's alleges. Then, he said that Plaintiff's "fairly limited" daily activities could not be objectively

---

[16]  Dr. Bhakta noted that Oxycodone can be addictive but stated he had no concerns of psychological addiction in Plaintiff's case. [Dkt. 8-4, p. 18].

verified with any reasonable degree of certainty and that they are difficult to attribute to Plaintiff's medical condition "as opposed to other reasons." [Dkt. 8, p. 18].   He characterized Plaintiff's medical treatment as "routine and conservative in nature."  He indicated he had compared Plaintiff's testimony with "prior statements and other evidence" and concluded that Plaintiff's pain is limiting but not severe enough to preclude all types of work.  He said: "the claimant has not provided convincing details regarding factors which precipitate the allegedly disabling symptoms, claiming the symptoms are present 'constantly' or all of the time." [Dkt. 8, p. 18].

Plaintiff's willingness to try pain management recommendations, including a discography, physical therapy, epidural injections and medication is well documented in the record.   The symptoms she complained of to her treating and examining physicians varied only when she reported on the effectiveness or ineffectiveness of those treatment regimens.  According to the treatment records, Plaintiff's symptoms were severe and consistent.   The ALJ's broad statement that Plaintiff's subjective statements are not entirely credible in light of discrepancies between her alleged symptoms and objective documentation in the file is contrary to the evidence in the record.  In addition, the ALJ neither linked his findings regarding Plaintiff's credibility to the evidence  nor adequately considered all of the evidence relevant to the credibility determination. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (holding that ALJ must closely and affirmatively link credibility findings to substantial evidence); *Hardman*, 362 F.3d at 679 (use of standard boilerplate language will not suffice).  As a result, the ALJ's finding regarding Plaintiff's credibility is not supported by substantial evidence.

_____

The ALJ did not sufficiently consider the medical evidence, including the opinion of Plaintiff's treating physician, and he did not properly evaluate Plaintiff's credibility. Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 11th day of December, 2009.

*Frank H. McCarthy*

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE